UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

MARILYN ELLEN PRALL,

Plaintiff,

v.

FORD MOTOR COMPANY and ROE COMPONENT PART MANUFACTURER,

Defendants.

Case No. 2:14-cv-001313-MMD-GWF

ORDER

(Def's Motion to Exclude Testimony – ECF No. 38; Def's Motion for Summary Judgment – ECF No. 39))

## I. SUMMARY

This case involves an alleged manufacturing defect that led to an automobile accident. Before the Court are Defendant Ford Motor Company's ("Ford") Motion to Exclude Testimony of Rocco Avellini ("Motion to Exclude") (ECF No. 38) and Motion for Summary Judgment ("Motion") (ECF No. 39). The Court has reviewed these motions as well as Plaintiff Marilyn Ellen Prall's ("Prall") responses (ECF Nos. 40, 41) and Ford's replies (ECF Nos. 42, 43). For the reasons discussed below, Ford's Motion to Exclude is granted and its Motion for Summary Judgement is granted in part and denied in part.

## II. BACKGROUND

In February 2013, while driving her 2003 Ford Taurus home from work, Prall rear-ended the vehicle in front of her. According to Prall, she was driving in stop-and-go traffic when she saw the car in front of her slow down or stop. She attempted to do the same, but her car continued to accelerate as she pressed the brake pedal, and she slammed

into the stopped car. (ECF No. 39-2 at 10.) Paramedics arrived at the scene and took Prall to the hospital, where emergency room doctors informed her she had fractured her right leg.[1] (*Id*. at 14-15.)

The driver of a 2003 Ford Taurus changes speed by controlling the amount of air entering the engine through a throttle plate. (ECF No. 39-6 at 7.) The driver can open the throttle plate by either pressing the accelerator pedal, which is connected to the throttle plate by a cable, or using the cruise control system, which is connected by a second cable called the speed control cable. (*Id*.) The end of the speed control cable has plastic pieces that clip into a collar to secure it in place. (*Id*.)

On June 21, 2013, a few months after Prall's accident, Ford implemented a program called Customer Satisfaction Program 13B04 ("Program 13B04"). In a notice about the program Ford sent to its dealers, it acknowledged that the speed control cable in certain vehicles, including Prall's Taurus, "may become susceptible to damage or becoming partially disconnected during under hood vehicle maintenance." (ECF No. 39-8.) According to the notice, if the speed control cable slides out of its collar, it could tangle and interfere with "the throttle's full return to idle when the accelerator pedal is released, potentially resulting in an elevated idle." (*Id*.) Ford instructed dealers to install a clip to reinforce the collar around the cable and, depending on the condition of the collar retention tabs, to replace the speed control cable itself. (*Id*.)

Prall took her Taurus to a dealership on August 24, 2013. A mechanic at the dealership inspected the speed control assembly and determined that the collar retention tabs were cracked but still present. Accordingly, he attached a collar reinforcement clip but did not replace the speed control cable. (ECF No. 39-9 at 4-5.)

Prall filed suit in state court on July 17, 2014, asserting a number of claims based on the allegation that the accident was caused by a mechanical failure — specifically a

[1]A few days later, while using a walker, Prall fell in her home and broke her right ulna. (ECF No. 39-2 at 15.) Her son brought her to the emergency room again, where doctors operated on both her wrist and leg. (*Id*.)

bound speed control cable as identified by Program 13B04. (ECF No. 1-1.) Pursuant to the parties' stipulation, the Court dismissed several of Prall's claims, leaving only claims for strict product liability and negligence. (ECF No. 23.) Ford now moves to exclude Prall's proposed expert testimony and for summary judgment on these remaining two claims.

## III. MOTION TO EXCLUDE

### A. Legal Standard

Fed. R. Evid. 702 permits a "witness who is qualified as an expert by knowledge, skill, experience, training, or education [to] testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

The Supreme Court provided additional guidance on Rule 702 and its application in *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). *Daubert* focused on scientific testimony and *Kumho Tire* clarified that *Daubert*'s principles also apply to technical and specialized knowledge. *See Kumho*, 526 U.S. at 141, 147-49. The trial court has "considerable leeway" in deciding how to determine the reliability of an expert's testimony and whether the testimony is in fact reliable. *Id*. at 152. The "test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id*. at 141.

The Ninth Circuit has emphasized that "Rule 702 is applied consistent with the liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony." *Jinro Am. Inc. v. Secure Investments, Inc*., 266 F.3d 993, 1004 (9th Cir.), opinion amended on denial of reh'g, 272 F.3d 1289 (9th Cir. 2001) (citations omitted). "An expert witness — unlike other witnesses — is permitted wide

latitude to offer opinions, including those that are not based on firsthand knowledge or observation, so long as the expert's opinion [has] a reliable basis in the knowledge and experience of his discipline." *Id*. (citations and quotation marks omitted). Shaky but admissible evidence should be attacked by cross examination, contrary evidence, and attention to the burden of proof, rather than excluded. *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), as amended (Apr. 27, 2010)

**B. Avelleni's Opinion**

Prall's designated expert witness, Rocco Avellini, is a seasoned auto-body repairman with decades of experience conducting and inspecting collision repairs. (ECF No. 40-1.) He is president of Wreck Check Car Scan Centers, a company that provides value estimates for vehicles and performs inspections for improper repair work and fraud. (ECF No. 38-5 at 4.) Avellini has offered expert testimony in a number of cases — for the most part concerning the diminished value of vehicles involved in accidents and the quality of repairs done to vehicles. (*See* ECF No. 40-1 at 14-20.)

Avellini created a "Vehicle Conditional Assessment" ("Report"), dated February 25, 2015, after personally inspecting Prall's Taurus and attending a subsequent inspection conducted by two Ford representatives. (ECF No. 40-1.) The Report, which contains about a half-page of explanation, concludes Prall's accident was caused by a defective speed control cable. (*Id*. at 20.) That conclusion appears to be based on speaking to Prall and her son, the existence of Program 13B04, and similar complaints from other Ford vehicle owners (which Avellini read about online). (*Id*.; *see also* ECF No. 38-5 at 24.)

Avellini further explained the basis for his conclusion during his deposition. Upon his initial inspection, Avellini did not see any damage to the speed control cable. (ECF No. 38-5 at 22.) In fact, he could not identify any evidence from Prall's Taurus which indicated that the speed control cable had become bound or in any other way malfunctioned. (*Id*. at 3.) Nor could Avellini explain how the problem identified by Program 13B04 would have caused Prall's Taurus to continue moving forward even as

she applied the brake. (ECF No. 38-5 at 22 ("How exactly it happened, I can't tell you ... But the fact is it happened, and there's other documentation out there that it has happened.").) When asked what exactly caused Prall's car to accelerate, Avellini answered "I couldn't tell you." (*Id.* at 23.) When asked what design would have prevented the accident, he gave the same answer. (*Id*.) When asked how an accelerator pedal could move to the floor on its own and increase RPMs and vehicle speed, Avellini answered that he did not know and "[w]e'll just leave it that Ford has an issue with this cable and acceleration problems." (*Id*.) Avellini did not know if the accelerator sticking would leave any physical evidence, nor did he know exactly what aspect of the speed control assembly malfunctioned. (*Id.* at 28.) He also could not determine that the cable slid out of the collar on the day of the crash. (*Id*.) Throughout his deposition, Avellini testified that his conclusion about the cause of Prall's accident is based on three pieces of evidence: 1) Prall's testimony; 2) Ford's program; and 3) news reports of other Ford vehicles that have accelerated unexpectedly. (*See id*. at 22, 24, 25, 28, 31).

After his deposition, Avellini prepared a Supplemental Vehicle Condition Assessment ("Supplemental Report") dated September 4, 2105. (ECF No. 40-1 at 60.) The Supplemental Report considered additional evidence including the deposition testimony of several witnesses, additional inspections of Prall's vehicle, a July 9, 2015 report by Ford's expert witness, Ford Field Service Action Records, and an examination of speed control cables in good condition. (*Id*. at 63.) Like the Report, the Supplemental Report contains about a half-page of explanation. (*Id*. at 64-65.) Avellini explains that after he removed the reinforcement clip he was able to slide the speed control cable in and out of the collar with no resistance. (*Id*. at 65.). The Supplemental Report does not add any further detail about the mechanism that caused Prall's vehicle to crash.[2]

---

[2]The Supplemental Report also contains the following conclusion: "I believe the location of the speed control cable is the design defect allowing the collar to be damaged during maintenance. Ford engineers should have notice to this [sic] defect during the design phase of the vehicle." (ECF No. 40-1 at 65.) However, the Court struck that portion of the report as untimely. (ECF No. 33.)

Avellini was deposed a second time on December 4, 2015. (ECF No. 38-9.) During the deposition, Avellini explained his Supplemental Report but did not offer any further explanation of how or why he believes Prall's car malfunctioned on the day of the accident.

**C. Analysis**

Avellini's opinion about the cause of Prall's accident is not based on "the knowledge and experience of his discipline," and is therefore not admissible. *Jinro*, 266 F.3d at 1004. This is not a question of shaky but admissible opinion evidence. Avellini is undoubtedly a knowledgeable and experienced auto repair specialist, as evidenced by his lengthy curriculum vitae and his past appearances as an expert witness. In this case, however, he has not provided any explanation for his opinion other than the existence of circumstantial evidence — evidence which a lay person is perfectly capable of understanding.

Throughout both reports and depositions, Avellini maintains that the reason he believes Prall's accident was caused by a faulty speed control cable is: (1) the accident occurred, (2) Prall testified that the car would not stop even as she applied the break, (3) Ford instituted Program 13B04, and (4) he found online other instances of similar vehicles experiencing acceleration problems. He also repeatedly testified that he did not believe Ford would spend millions of dollars on a repair program if there was not a serious safety issue. (*See, e.g*. ECF No. 38-9 at 10 ("I can say that if a company was willing to spend almost $10 million on a repair, there's an issue there.")) However, this line of reasoning does not require any specialized insight. Nor would such reasoning be needed to help the jury understand the evidence, who may draw these inferences on their own. Allowing Avellini to offer this opinion testimony would be akin to allowing a brain surgeon to testify that he believes a head injury was caused by a plaintiff slipping on a banana peel because: (1) the plaintiff slipped, (2) there was a banana peel nearby, and (3) shortly afterwards the owner of the site of the accident implemented a plan to keep the floor clear of banana peels. While the conclusion may be plausible and

consistent with the evidence, the brain surgeon's opinion is not based on her specific expertise.

Further, when asked for specifics Avellini simply points to Program 13B04 to explain the mechanics of the problem he believes occurred. However, where Avellini disagrees with the conclusions of Program 13B04 — namely that the problem does not pose a safety risk — he does not provide any sort of counter-explanation to show why. For example, based on testing it conducted, Ford determined that if the speed control cable slid out of its collar and became bound, the "worst case scenario" would be a 26-29% throttle opening. (ECF No. 38-4 at 5.) According to Ford's testing, that type of throttle opening could be easily overcome by the vehicle's brakes. (*Id*. at 15.) So, if as part of his expert opinion Avellini wants to rely on the problem identified by Program 13B04, he must have some explanation for why his conclusion is different from the conclusions reached by Program 13B04. For example, he might have testified that based on his experience or on testing that he conducted, the throttle opened more than 29%, and therefore it is not clear that the car's brakes could stop its forward movement. Or he might have testified that according to his experience or tests he conducted, Ford was mistaken and in fact the Taurus' brakes could not easily overcome a 29% opened throttle. Instead, Avellini simply asserts that Ford's conclusions were wrong because Prall continued forward after slamming on her brakes. In other words, Avelleni concludes that the existence of one event after the existence of another is sufficient to prove the first event caused the second. This is a logical fallacy — *post hoc ergo propter hoc*. While the existence of the 13B04 problem is necessary to conclude that it was the cause of the accident, it is not, in itself, sufficient to establish causation.

For these reasons, Avellini's proffered expert testimony does not meet the standards of reliability in *Daubert* and *Kumho Tire*. Ford's Motion to Exclude is granted as it relates to Avellini's opinion that the accident was caused by the issue identified in Program 13B04.

///

## IV. MOTION FOR SUMMARY JUDGMENT

### A. LEGAL STANDARD

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (*quoting First Nat'l Bank v. Cities Service Co*., 391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that

there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

**B. Strict Liability**

Under Nevada law, a plaintiff must establish three elements to show strict liability: "(1) the product had a defect which rendered it unreasonably dangerous, (2) the defect existed at the time the product left the manufacturer, and (3) the defect caused the plaintiff's injury." *Fyssakis v. Knight Equip. Corp*., 826 P.2d 570, 571 (Nev. 1992). In *Stackiewicz v. Nissan Motor Corp., U.S.A*., 686 P.2d 925, 928 (Nev. 1984), the Nevada Supreme Court held that "proof of an unexpected, dangerous malfunction may suffice to establish a prima facie case for the plaintiff of the existence of a product defect." *Stackiewicz*, which also involved an automobile defect, dealt with a plaintiff who was injured when her steering wheel locked, which caused her car to flip. The plaintiff was not able to produce any expert testimony about the cause of the locked steering wheel. Still, the court held that in certain cases "the factfinder can find, where other identifiable causes are absent, that the mere evidence of a malfunction is sufficient evidence of a defect." *Id*. The *Stackiewicz* court approvingly cited a number of cases from other jurisdictions wherein courts have held that evidence of a vehicle malfunctioning could be sufficient to support liability even if the exact cause of the malfunction was not established. *Id*. at 928-29 (citing *Greco v. Bucciconi Engineering Co*., 407 F.2d 87 (3d Cir.1969); *Tweedy v. Wright Ford Sales, Inc*., 357 N.E.2d 449 (Ill. 1976); and *Vanek v. Kirby*, P.2d 778, 779 (Or. 1969)).

///

The parties do not dispute that Prall was involved in an accident and the accident was the cause of her injury. Nor do the parties dispute that the Program 13B04 problem existed when the vehicle left the manufacturer. The issues of contention are (1) whether the vehicle had a defect that rendered it unreasonably dangerous and (2) whether that defect was the cause of Prall's accident. On summary judgment, the Court must accept Prall's undisputed testimony that she pressed on the brake pedal but the car continued moving forward, and draw all reasonable inferences in her favor. Under the guidelines laid out by the Nevada Supreme Court in *Fyssakis* and *Stackiewicz*, Prall has offered evidence upon which a reasonable fact finder could conclude that all three elements of her strict liability claim have been met.

Ford argues that Nevada law requires Prall to show that there is no reasonable alternative explanation for the accident other than a product defect. (ECF No. 43 at 2.) According to Ford, a clear reasonable alternative exists: Prall mistakenly pressed the accelerator instead of the break. Ford believes this means Prall cannot rely on proof of the malfunction occurring as proof of a defect.

Ford's argument misunderstands the rule announced in *Fyssakis* and *Stackiewicz*. While it is true that those cases, and the various published and unpublished opinions cited by Ford in its reply, incorporate a requirement that "other identifiable causes are absent," the context in which the Court evaluates that requirement is Ford's motion for summary judgment. Therefore, the Court credits Prall's testimony that she applied the brake as true. Ford's argument about alternative causes requires the Court to ignore the standard governing summary judgment — the Court must resolve factual disputes and construe all reasonable inferences in favor of the non-moving party. In other words, if all of the facts of this case were the same, with the additional fact that the road Prall was driving on was covered with patches of ice, then Ford's argument would be persuasive. The Court would accept Prall's testimony that she applied the brake as true, but find that the accident may have been caused by the car sliding over ice rather than a problem with the acceleration. Presented with such a scenario, Prall would need

to provide some evidence to narrow the cause of Prall's accident. However here, Prall *has* eliminated alternative explanations for the accident by providing testimony that she applied the brakes, rather than mistakenly hitting the accelerator.

Prall's testimony and the other circumstantial evidence in the record are sufficient to establish a prima facie case of strict product liability. Therefore, Prall's strict liability claim rests on disputed material issues of fact to be resolved by a jury, and Ford's Motion is denied with respect to the strict liability claim.

**C. Negligence**

While strict liability focuses on the product and consumer expectations, negligence focuses on the manufacturer's conduct. *See Smith v. Wolf Performance Ammunition*, No. 2:13-CV-2223-JCMNJK, 2015 WL 2359063, at *3 (D. Nev. May 18, 2015). To prevail on a negligence claim, "a plaintiff must establish four elements: (1) the existence of a duty of care, (2) breach of that duty, (3) legal causation, and (4) damages." *Klasch v. Walgreen Co*., 264 P.3d 1155, 1158 (Nev. 2011).

Ford relies on the same argument it offered in seeking summary judgment on Prall's strict liability claim — Prall has not produced evidence to show any defect caused by negligence or any evidence that a defect caused her injury. (ECF No. 39 at 10-11.)

While Prall may rely on "evidence of malfunction" in the product liability context, Nevada does not appear to have extended that rule to simple negligence claims. Prall has not provided, nor can the Court find, case law applying that concept in simple negligence claims, and likely for good reasons. Strict product liability is premised on important policy considerations. As the Nevada Supreme Court explained when it first adopted the doctrine of strict liability: "The public interest in human safety requires the maximum possible protection for the user of the product and those best able to afford it are the suppliers of the chattel." *Shoshone Coca-Cola v. Dolinski*, 420 P.2d 855, 857 (Nev. 1966) (quoting William L. Prosser, *The Fall of the Citadel*, 50 Minn. L. Rev. 791 (1966)). The *Stackiewicz* rule, which is a type of burden shifting mechanism, places the burden of showing a malfunctioning product was *not* designed or manufactured

defectively on the manufacturer because they, rather than the consumer, are in the best position to understand and ensure the safety of the product. Thus, the rule is unique to the product liability context.

Nevada does recognize the related doctrine of *res ipsa loquitor*, which allows a plaintiff to establish negligence by inference if "(1) the event [is] of a kind which ordinarily does not occur in the absence of someone's negligence; (2) the event [is] caused by an agency or instrumentality within the exclusive control of the defendant; and (3) the event must not have been due to any voluntary action or contribution on the part of the plaintiff." *Woosley v. State Farm Ins. Co*., 18 P.3d 317, 321 (Nev. 2001) (quoting *Bialer v. St. Mary's Hospital*, 427 P.2d 957, 958 (Nev. 1967)). Here, however, Prall's Taurus was clearly not in Ford's exclusive control, so the doctrine does not apply.

Therefore, in order to establish her negligence claim, Prall must produce evidence that the accident (and consequently her injury) was caused by Ford breaching a duty owed to her. The only causation evidence that Prall has produced is the expert opinion of Avelleni, which, for the reasons discussed above, does not meet the requisite standards for opinion testimony. For these reasons, Ford has demonstrated that Prall has failed to meet her burden of production, and Ford's Motion is granted with respect to Prall's negligence claim.

## V. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion and the Motion to Exclude.

It is therefore ordered that Ford's Motion to Exclude (ECF No. 38) is granted.

///

///

///

///

It is further ordered that Ford's Motion for Summary Judgment (ECF No. 39) is granted in part and denied in part. The Motion is granted with respect to Prall's negligence claim and denied with respect to her strict product liability claim.

DATED THIS 24th day of January 2017.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE